JOSEPH J. HOOTON AND ROBERT W. HILL, EXECUTORS OF THE LAST WILL AND TESTAMENT OF HU WOODWARD, DECEASED, APPELLANTS, v. AARON K. NEELD, DEPUTY DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY OF NEW JERSEY, RESPONDENT.

Argued March 16, 1953—Decided June 1, 1953.

*Mr. Ira C. Moore, Jr.,* argued the cause for the appellants (*Messrs. Whiting, Moore & Phillips,* attorneys).

*Mr. William A. Moore* argued the cause for the respondent (*Mr. Theodore D. Parsons,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

BURLING, J. This appeal was addressed to the Superior Court, Appellate Division, as an action in lieu of the former prerogative writ of *certiorari* under *Rule* 3:81, by Joseph J. Hooton and Robert W. Hill, executors of the last will and testament of Hu Woodward, deceased (hereinafter termed the appellants) against Aaron K. Neeld, Deputy Director, Division of Taxation, Department of the Treasury, State of New Jersey (hereinafter referred to as the respondent), to review

an assessment and levy of New Jersey transfer inheritance tax upon *inter vivos* transfers of stock of the South-Western Publishing Company, a Tennessee corporation (hereinafter referred to as South-Western). Prior to final hearing before the Superior Court, Appellate Division, the appeal was certified here upon our own motion.

The appeal is presented by the parties upon a stipulation of facts together with the record of remand proceedings in the New Jersey Transfer Inheritance Tax Bureau (hereinafter called the Bureau) ordered by the Superior Court, Appellate Division, pending this appeal.

, The decedent, Hu Woodward, died testate on April 9, 1950, a resident of Montclair, Essex County, New Jersey. A tentative state inheritance tax was paid on March 21, 1951. Subsequently the Bureau following audit of the state inheritance tax return, on May 21, 1952 made an assessment of transfer inheritance taxes, based upon a redetermination of the *quantum* of the estate of Hu Woodward, deceased, increasing the reported value of corporate stocks and changing allowances of administration expenses. The assessment included "direct" taxes of $9,282.65 upon taxable interests or property in the amount of $438,179 (out of a net taxable estate of $662,746.73), and in addition a "compromise" tax of $7,334.86 upon that portion ($209,567.54) of the net taxable estate which represented contingent remainder interests created under and by virtue of the terms of the decedent's will. The balance of the "direct" tax assessed was paid on June 2, 1952; the balance of the "compromise" tax due on contingent remainder interests under the will was paid on June 10, 1952.

The executors' appeal is stated to be: "from the assessment and levy of taxes upon the transfers of stock of South-Western Publishing Company by the decedent, Hu Woodward, in his lifetime to his two daughters, Pauline Woodward, now Pauline W. Hill, and Cecil Woodward, now Cecil W. Hooton, which assessment and levy were made on May 21, 1952."

The subject transfer of stock involved a total of 104 shares of stock of South-Western, which had not been included in

the return filed, but was determined by the Bureau to be within the contemplation of the New Jersey transfer inheritance tax statute and was valued at $333,727.68. This stock transfer was the sole basis of that portion of the "direct" tax allocated to property passing to each of the decedent's daughters, Cecil W. Hooton and Pauline W. Hill, namely a tax assessed at $3,624.55 as to the interest of each daughter.

The assessment and stipulation show that the tax was assessed upon the premise that the stock was taxable as a gift "in contemplation of and (intended) to take effect at or after death." This appeal does not involve the valuation of the stock but merely contests the taxability of the transaction in and by virtue of which the transfer occurred. The incidents of this transaction will be hereinafter detailed.

Pending hearing of the appeal the Superior Court, Appellate Division, by order of October 14, 1952, while retaining the appeal remanded the cause for the purpose of enabling the appellants to supplement the record. This order provided that the Bureau should make a determination on the record as supplemented and that in the event the new determination should be adverse to the appellants, the parties should file a supplemental appendix and supplemental briefs and bring the whole matter on for argument of the appeal. This course was pursued, the respondent apparently making no effort to take an interlocutory appeal to this court from said order. The Bureau made a supplemental determination of facts adverse to the appellants, and the supplemental appendix and briefs were filed in the Superior Court, Appellate Division. Prior to hearing there, as hereinbefore noted, the appeal, as supplemented, was certified upon our own motion.

### ADJECTIVE

It is contended by the respondent that the Superior Court, Appellate Division, had no jurisdiction to enter the order of October 14, 1952, *ante,* to allow the appellants to supplement the record. There appears to have been no motion

by the respondent addressed to either the Superior Court, Appellate Division, or to this court to vacate the order of October 14, 1952. The entry thereof does not appear to have been resisted and no attempt to appeal therefrom is called to our attention. Without determining whether such an order is appealable, or whether the respondent's course of failure to move to vacate the order or to expunge that portion of the record attributable to proceedings under that order constitutes a waiver of the point, we hold that under the circumstances of this case the order was within the discretion of the Superior Court, Appellate Division, under *Rules* 3:81–9 and 4:1–10. The order of remandment permitted the introduction of evidence and the assertion of a question involved which otherwise must have been relegated to a proceeding in the Division of Taxation for tax refund under *R. S.* 54:35–10 as amended by *L.* 1944, *c.* 74, *p.* 150, *sec.* 1, *N. J. S. A.* 54:35–10. Incorporation of the supplemental evidence, and inclusion of the supplemental question of law involved, in the present appeal under the circumstances of this case permitted early determination of these matters in one proceeding, thus facilitating business of the State and advancing justice. See *Rule* 4:1–10, *supra*, which on this basis permits relaxation of the conditions expressed in *Rule* 3:81–9 as a limitation upon application for leave to supplement the record.

## THE MERITS

The questions involved on this appeal may be summarized as follows:

(a) Is the assessment of New Jersey transfer inheritance tax valid in this case where made in connection with the irrevocable *inter vivos* transfer of intangible personal property encompassing a reservation of income to the transferor?

(b) Is the State of New Jersey, as the domiciliary State of the decedent in this case, deprived of jurisdiction to tax the irrevocable *inter vivos* transfer of intangible personal property made by him and intended to take effect in posses-

sion or enjoyment at or after the death of the transferor by virtue of the fact that such transfer is effectuated pursuant to the terms of a transaction or deed of gift allegedly made in another state while the transferor was there domiciled?

The controversy hinges around the alleged applicability of the case of *MacClurkan v. Bugbee*, 106 *N. J. L.* 192 (*E. & A.* 1930). The appellants adhere to the position that such application is dispositive. The respondent advances the proposition that the *MacClurkan* case, *supra*, should be overruled.

The *MacClurkan* case, *supra*, held that the Legislature did not provide in the Transfer Inheritance Tax Act for the taxation of a transfer of intangible personal property in trust under an irrevocable trust deed executed and ·delivered by the transferor while a non-resident where the sole right retained by the transferor was the right to receive the income from the property transferred, even though the transferor subsequently moved to this State and died a resident hereof. The Legislature has seen fit to acquiesce in the interpretation accorded the *MacClurkan* case, *supra*. Although the statute has been amended during the 23 years that have· elapsed since the *MacClurkan* decision, no change in the statutory language affected thereby has been enacted. We find no merit in the respondent's contention that an amendment was effected by change in verbiage of the pertinent section of the statute (*R. S.* 54:34–1, *c*) made at the time of the adoption of the *Revised Statutes of* 1937.

The facts in this case to be drawn from the stipulation entered into between the appellants and the respondent at the inception of this appeal, and to be derived from the record as supplemented on remand for that purpose show the following chronology of events:

The decedent, Hu Woodward, on February 10, 1927 was a resident of Staunton, Virginia, where he had made his home from 1923 to 1931. During that period his wife, Nina Woodward, and their daughters, Cecil (born August 21, 1907) and Pauline (born October 10, 1909), resided with him there.

On February 10, 1927 the decedent, Hu Woodward, who was then the owner of 106 shares of capital stock of South-Western, transferred the certificates for 52 of said shares to his daughter, Pauline Woodward (now Pauline W. Hill), and for 52 of said shares to his daughter, Cecil Woodward (now Cecil W. Hooton). He died possessed of the two shares retained by him which were separately taxed. The transferred stock was registered in the names of said daughters on the books of the company and stock certificates were issued and delivered to each in their respective names. At the same time Nina Woodward transferred to each daughter a certificate for 80 shares of stock of South-Western. The evidence is not conclusive but at the time some or all of the initial steps in the transfers of the South-Western stock were actually made the entire family may have been sojourning at a hotel in New York City but without doubt were domiciled in Virginia.

The terms and conditions of these transfers initially were set forth in separate letters signed by the decedent and respectively addressed to his two daughters and to Mr. J. W. Baker, then the president and secretary of South-Western, dated February 10, 1927 and February 17, 1927, respectively. The text of the controlling letter was as follows:

"Dear Pauline and Cecil:

Your mother and I have been thinking over the desirability of making some provision for your future and have decided to transfer to you some stock in South-Western Publishing Company which we have owned. Accordingly I have transferred 104 shares and your mother has transferred 160 shares, making a total of 264 shares, so that each of you now has 132 shares in your names, thus making an equal division between you.

However, *you will not receive the dividends during our lifetimes.* At the same time that I had the stock certificates transferred to your names I instructed the Company to continue to pay the dividends to your mother and me so long as we live; but *on her death you will begin to receive, equally between you, the dividends on the shares she has transferred, and on my death will receive, also equally between you, the dividends on the shares I have transferred.*

Your mother and I intend this transfer to be a permanent one and without any right on our part to revoke it; but as we have reserved the dividends you will understand that *you are in a sense trustees for us during our lives, and that you cannot freely sell the stock and dispose of the. principal,* and that if at any time you receive any of the dividends they must be paid over to us.

You have now received the stock certificates registered in your names; they are important and valuable, and should be carefully kept in your own safe deposit box.

Affectionately,

(signed)  Hu Woodward<br>
(signed)  Nina Woodward

(signed)  Pauline Woodward
(signed)  Cecil Woodward

Feb. 10, 1927."    (Emphasis supplied)

It does not appear that either daughter was *sui juris* at the time these steps were taken; under the laws of New York (where these steps in the transaction may have taken place), Virginia (where the parties were domiciled in 1927), Tennessee (the home of the corporation), or New Jersey (where the transferor subsequently became a resident and of which state he died a resident decedent).

In June 1931 the entire family moved to and established residence in Montclair, Essex County, New Jersey; Pauline married Robert W. Hill (now one of the executors of the will of Hu Woodward, deceased) on November 7, 1931. The Hills remained residents of New Jersey until 1938, when they moved to and established residence in Cincinnati, Ohio (where the principal office of South-Western is located) and have since remained residents of that city and state. Cecil married Joseph J. Hooton (now one of the executors of the will of Hu Woodward, deceased) on June 28, 1934. The Hootons resided in New Jersey until 1941 when they moved to Winnetka, Illinois. They resided in Illinois until 1951 when they moved to their present residence in Palm Beach, Florida.

On December 24, 1936, Pauline and Cecil wrote the following letter to South-Western:

"Montclair, N. J., December 24, 1936
South-Western Publishing Company
201-3 West Fourth Street,
Cincinnati, Ohio
*Attention of Mr. J. W. Baker, Pres. and Sec'y*
Dear Sirs:

We understand that you desire for your files our written order for the payment to our parents, Mr. and Mrs. Hu Woodward of the dividends upon stock registered in our names.

We hereby state and confirm that the terms of the transfer by which we acquired the stock from them in 1927 provided that they should continue to receive the dividends on the shares registered in their names, respectively.

We understand that Mr. Woodward so instructed you at the time of the transfer, and that the dividends have actually been so paid. You may accordingly take this letter as your approval of the payments heretofore made and as an order to you to continue such payments, to wit, of the dividends on the 264 shares in our names to pay to Mr. Hu Woodward dividends on 104 shares and to pay Mrs. Nina Woodward dividends on 160 shares.

Yours very truly
(Signed) Pauline W. Hill
Mrs. Robert W. Hill
59 Tuxedo Road
(Signed) Cecil W. Hooton
Mrs. Joseph J. Hooton
206 Bellevue Avenue

On September 15, 1937 the decedent released to each of his said daughters his right to receive one-half of the dividends on the shares of stock of South-Western which he had transferred to her. The corporation was notified of this release by letters (dated at Montclair, New Jersey, September 15, 1937) from Pauline W. Hill and Cecil W. Hooton, the record owners (on the books of the corporation) of the shares in question, and this was confirmed by letter (dated at Montclair, New Jersey, September 20, 1937) from the decedent, Hu Woodward, to the president of the company (addressed "Dear J. W."). The president of the company then gave instructions for the drawing of checks by an inter-office communication (dated October 5, 1937). Thereafter one-half of the dividends were paid to the daughters. The letters of the daughters show that Nina Woodward also released to the daughters one-half of the South-Western

stock dividends which had been reserved to her. The significant portion of Hu Woodward's 1937 letter to South-Western reads as follows:

"Nina and I have talked the matter over and have decided that commencing with the October dividend that we want each of the girls to have one fourth (¼) of all dividends hereafter so when you are ready will you make draft payable to Mrs. Pauline W. Hill, 59 Tuxedo Road, Montclair, for one fourth and Mrs. Cecil W. Hooton, 206 Bellevue Avenue, Montclair, for one fourth, and the remainder of one half you can send to me, and in reporting this to the government you can show that *each of the four of us have received one fourth and this will make the taxes less and give the girls something while we can see them have it.*" (Emphasis supplied.)

The principal problem confronting the court under the foregoing circumstances is to determine where and when the irrevocable *inter vivos* transfer of South-Western stock occurred.. This is vital to the determination whether the transfer, which obviously was a trust, occurred while the transferor, Hu Woodward, was a resident of Virginia (in which case the initial transfer is within the rule of the *MacClurkan* case, *supra,* and is not taxable under the provisions of the statute now incorporated in *R. S.* 54:34–1, *c*) or a resident of New Jersey, in which event the initial transfer would be taxable.

It is settled that the "validity of a trust of choses in action created by a settlement or other transaction *inter vivos* is determined by the law of the place where the transaction took place." *Conry v. Maloney,* 5 *N. J.* 590, 593 (1950).

The full "transaction" in this case, constituting the "transfer" which has been subjected to the New Jersey transfer inheritance tax assessment, was the creation of a trust the *corpus* of which consisted of shares of corporate stock but the immediate equitable or beneficial interest in which, namely the dividends or income of the trust, was vested in the transferor.

There is considerable difficulty in reaching a determination as to the exact time or place where a trust is established and has its *situs*. The "transaction" rule governs in

this State as to a trust of *choses in action*. Residence or domicile of the settlor and of the trustee, location of the assets, place of making the effectuating instruments and the intent of the settlor are factors, but none of itself is absolutely controlling. See *Wilmington Trust Co. v. Wilmington Trust Co.*, 26 *Del. Ch.* 397, 24 *A.* 2d 309, 139 *A. L. R.* 1117, 1126–1127 (*Sup. Ct.* 1942), and annotations on conflicts of laws as to trusts *inter vivos* at 139 *A. L. R., pp.* 1129 *et seq.* Compare *Bankers' Trust Co. v. Bacot*, 6 *N. J.* 426, 432–433 (1951).

██ Under the circumstances of this case it is clear that the transferor intended the completed transfer to be effective when he made the transfer of stock in 1927. His beneficial interest in the dividends was validly and effectively reserved to him in the terms of the letters to his daughters and to the corporation. The minority of the two daughters-trustees at the time of the several initial steps of the transaction is not asserted to have any contrary effect. An acceptance by a trustee is not required in all cases to assure the rights and interests of the beneficiary and if the trustee intends to decline the trust he should execute a disclaimer. 4 *Pomeroy's Equity Jurisprudence* (*5th ed.* 1941), sec. 1060, p. 158.

██ An infant may take and hold property in trust although he is subject to the same disabilities in administering the trust as in dealing with his own property and in making contracts. 3 *Pomeroy's Equity Jurisprudence* (*5th ed.* 1941), sec. 987c, p. 919. See 1 *Restatement of the Law, Trusts* (1935), sec. 91, p. 261; sec. 109, p. 286. An infant's acceptance of a trust may be confirmed or disclaimed upon his coming of age. *Cf. Ownes v. Ownes*, 23 *N. J. Eq.* 60, 63 (*Ch.* 1872); *Mott v. Iossa*, 119 *N. J. Eq.* 185, 191 (*Ch.* 1935); *Scott on Trusts* (1939), sec. 91, p. 497. Compare 54 *Am. Jur., Trusts, sec.* 115, p. 101. In this case both daughters attained majority prior to the family's removal to New Jersey. They treated the stock as trust property and made no effort to disclaim the trust. Their conduct in the premises constitutes ratification under the facts adduced in this case.

In 1936, when the trust and the trustees' acceptance thereof were expressly confirmed in writing, both the trustees and the life tenant (transferor) were domiciled in New Jersey and the trustees' letters of confirmation and acceptance of the trust were executed in New Jersey, but this circumstance was not in itself sufficient to constitute the prior transaction a "transfer" made by a New Jersey resident within the terms of *R. S.* 54:34–1, *c*, under the evidence adduced in this case.

In view of these conclusions, which render the entire transfer free of the assessment, it is unnecessary to determine whether the subsequent release of income by the transferor in 1937 removed a portion of the transfer from the taxable class.

For the reasons expressed in this opinion that portion of the assessment and levy of New Jersey transfer inheritance tax in the Matter of the Estate of Hu Woodward, deceased, subjected to this appeal, as made on May 21, 1952 by the Transfer Inheritance Tax Bureau, Division of Taxation, Department of The Treasury, State of New Jersey, is set aside.

HEHER, J. (dissenting in part). The absolute and unconditional transfer on September 15, 1937, when the now deceased donor was a resident of New Jersey, of one-half of the dividends thereafter accruing on the stock vested in the donees complete title to and the full possession and beneficial enjoyment of one-half of the stock; by the donor's continued reservation of the remainder of the dividends, the beneficial enjoyment of the remaining one-half of the stock vested in the donees on the death of the donor, and this latter transfer is taxable as property to which the donees succeeded on the donor's demise. This was a gift intended to take effect "in possession or enjoyment" at or after the donor's death. Compare *Hartford v. Martin*, 122 *N. J. L.* 283 (*E. & A.* 1939); *Commissioner of Internal Revenue v. Church*, 335 *U. S.* 632, 69 *S. Ct.* 322, 93 *L. Ed.* 288 (1948), overruling *May v. Heiner*, 281 *U. S.* 238, 50 *S. Ct.* 286, 74

L. Ed. 826 (1930), which was followed in *MacClurkan v. Bugbee*, 106 *N. J. L.* 192 (*E. & A.* 1930).

I would modify the judgment accordingly.

*For reversal*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For modification*—Justice HEHER—1.